**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **RICARDO VÉLEZ AMADOR; ET AL.,** | **Civil No**. 17-2050 (DRD) |
| *Plaintiffs,* | 17-2168 (DRD) |
| | 17-1502 (DRD) |
| V. | 17-2145 (DRD) |
| **GUILLERMO GARCÍA TORRES, ET AL.,** | |
| *Defendants.* | **Consolidated Cases** |
| **IN THE MATTER OF:** | |
| **GUILLERMO GARCIA TORRES; HIS WIFE ROSA MONTERO-VARGAS AND THE CONJUGAL PARTNERSHIP BETWEEN THEM,** | |
| FOR EXONERATION FROM OR LIMITATION OF LIABILITY AS OWNER OF THE M/V LA NENA II | |
| *Plaintiffs-Petitioners.* | |

**_OMNIBUS_ OPINION AND ORDER**

Pending before the Court are the following motions: Plaintiffs, Third-Party Plaintiffs, Cross-Claimants and Claimants in the Limitation Action, Claude McCann, Sylvie Laurin, Julie McCann, minor JHM, Vincent Boileau, and minor SBC (hereinafter the "McCann Group"); Third Party Plaintiffs, Counter-Claimants and Claimants in the Limitation Action, Sharisse J. Johnson and Lourdes Beth Rodriguez (hereinafter the "Johnson-Rodríguez group"); Claimants in the Limitation Action Mario R. Ortega, Argyro Ortega, minor AGO, and minor MAO; Claimants in the Limitation Action, Gerardo Hernández, Evelyn Meléndez, minor C.H.M., Walter Ortega, Merlyn Meléndez, and minor B.O.M.; Claimant in the Limitation Action, Somara Soto Rodríguez's (collectively, the "Claimants") (1) *Motion for Summary Judgment and Memorandum of Law In*

*Support Thereof* (Docket No. 172)[1] and (2) *Joint Motion for Partial Summary Judgment Deciding that the Insurer and the Captain of the Charter Tourist Boat La Nena II are not Entitled to Limit their Liability Under the Shipowners' Limitation of Liability Act and Memorandum of Law in Support Of* Docket No. 174)[2]; and Plaintiffs-Petitioners, Guillermo García-Torres, his wife Rosa Montero-Vargas, and the Conjugal Partnership Between Them, as owners of the M/V LA NENA II, and Guardian Insurance Company's (3) *Memorandum in Support of Motion for Summary Judgment* (Docket No. 177)[3].

For the reasons stated herein, Claimants' *Motion for Summary Judgment and Memorandum of Law In Support Thereof* (Docket No. 172) and *Joint Motion for Partial Summary Judgment Deciding that the Insurer and the Captain of the Charter Tourist Boat La Nena II are not Entitled to Limit their Liability Under the Shipowners' Limitation of Liability Act and Memorandum of Law in Support Of* Docket No. 174) are hereby **GRANTED.** In turn, Plaintiffs-Petitioners' *Memorandum in Support of Motion for Summary Judgment* (Docket No. 177) is hereby **DENIED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The underlying petition filed by Plaintiffs-Petitioners seeks to limit their potential liability as owners of the M/V LA NENA II (hereinafter, "LA NENA II"). Plaintiffs-Petitioners' exposure to liability stems from a collision between LA NENA II and the recreational vessel M/V ANDREA GABRIELA (hereinafter, "ANDREA GABRIELA"), during a voyage between La Parguera village to the nearby Bioluminescent Bay on the evening of July 25, 2017. During the voyage to the

---

[1] An *Opposition* and three (3) *Replies* were subsequently filed. *See* Docket Nos. 199. 216, 222 and 228, respectively.
[2] An *Opposition* and a *Reply* were subsequently filed. *See* Docket Nos. 202 and 220, respectively.
[3] An *Opposition*, two (2) *Replies* and a *Surreply* were subsequently filed. *See* Docket Nos. 204, 217, 227 and 229, respectively.

Bioluminescent Bay, LA NENA II was struck on her port aft quarter by ANDREA GABRIELA. Since the collision, four (4) tort cases have been filed in the District Court to recover damages suffered as a result thereof. On September 1, 2017, Plaintiffs-Petitioners filed a *Complaint-Petition for Exoneration From or Limitation o Liability* (consolidated case no. 17-2168 Docket No. 5).[4] The United States *Limitation of Shipowner's Liability Act*, 46 U.S.C. §§ 30501-30512, and Rule F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Supplemental Rule F, provide for ship owners to seek this type of liability limitation for potential fault or negligence stemming from an accident similar to that between LA NENA II and ANDREA GABRIELA.

On March 11, 2020, Claimants filed a *Motion for Summary Judgment and Memorandum of Law In Support Thereof* (Docket No. 172)[5] and *Joint Motion for Partial Summary Judgment Deciding that the Insurer and the Captain of the Charter Tourist Boat La Nena II are not Entitled to Limit their Liability Under the Shipowners' Limitation of Liability Act and Memorandum of Law in Support Of* Docket No. 174)[6]. Plaintiffs-Petitioners filed on that same day, a *Memorandum in Support of Motion for Summary Judgment* (Docket No. 177).[7]

In synthesis, the Claimants seek dismissal of the Plaintiffs-Petitioners' *Complaint-Petition* as LA NENA II was not manned in accordance with law and regulation. Specifically, Claimants aver that at the time of the incident, LA NENA II was operated in violation of her *Certificate of*

---

[4] See Docket No. 1. All claims were consolidated into 17-cv-2050.

[5] A *Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* was also filed. *See* Docket No. 178.

[6] A *Joint Statement of Uncontested Material Facts in Support of Motion for Partial Summary Judgment Deciding that the Insurer and the Captain of the Charter Tourist Boat La Nena II are not Entitled to Limit their Liability under the Shipowners' Limitation of Liability Act* was also filed. *See* Docket No. 175.

[7] A *Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* was also filed. *See* Docket No. 176.

*Inspection* by operating without a qualified deckhand. Instead, LA NENA II was being operated with a master, José Hernández-Zapata and a "swimmer", Juan Pablo Quiñones Espinosa. Claimants conclude that:

> " . . . based on numerous admissions that LA NENA was knowingly allowed to sail undermanned in violation of her Certificate of Inspection and in violation of the mandate that she not leave the dock, Exoneration and Limitation should also be denied outright even absent the presumption arising from the Pennsylvania Rule."

Docket No. 172 at 27.

On July 7, 2020, Plaintiffs-Petitioners filed an *Opposition to Motion for Summary Judgment* (Docket No. 199). Petitioners essentially argue that "Claimants are in the untenable position of seeking place to blame for the causation of the collision on the LA NENA II, rather than on the clearly overtaking vessel, the ANDREA GABRIELA, only because the owners/operators of the latter claim to be devoid of financial means to respond for an adverse judgment." Docket No. 199 at 24. Furthermore, as to the lack of a Deckhand during the voyage, Plaintiffs-Petitioners assert that,

> "[t]he presence of a deckhand could not have prevented the occurrence of the accident. As a matter of fact, Mr. Vélez claims having designated all of the passengers onboard the ANDREA GABRIELA as lookouts and, still, none of them ever saw the LA NENA II before the impact. In other words, the absence of a deckhand was not the cause of the accident. At this juncture, Claimants have not established this fact, nor will they be able to establish it."

*Id.* Proper analysis of the parties' motions require scrutiny of the underlying legal framework. However, as all motions are based on the same controversies regarding the Exoneration or Limitation of Liability as to LA NENA II, the Court will discuss them simultaneously.

## II.    FACTUAL FINDINGS[8]

The following factual findings are taken from the parties' statements of undisputed facts, and supported documentation. Upon careful review of the record, the Court finds the following facts are undisputed:

### A.  *M/V LA NENA II*

1. At all times material to this action, Mrs. Rosa Montero-Vargas was, and continues to be, the wife of Mr. Guillermo García-Torres. *See Mr. García-Torres' Deposition*, Docket No. 200, Exhibit 1, pp. 7- 8.

2. At all times material hereto, Mr. García-Torres was and is a resident of Lajas, Puerto Rico. *See* Docket No. 1, ¶ 3.

3. Mr. García-Torres is the registered owner of vessel LA NENA II since 1998. *See id.*, p. 47; *see also* Certificate of Inspection, Docket No. 175, Exhibit 1; *see also* Credentials of the Master of M/V LA NENA II, GIC 23, Docket No. 200, Exhibit 6.

4. On the date of the incident and for the past 22 years, Mr. García-Torres has held a U.S. Coast Guard Captain's license which was current and will remain valid until the year 2021 and which has allowed him to act as Captain on LA NENA II. *See Mr. García-Torres' Deposition*, Docket No. 178, Exhibit 15, pp. 26-27.

5. Mr. García-Torres operates Torres Boat Rental since 1986. *See* Docket No. 200, Exhibit 1, p. 13.

---

[8] Some of the *Factual Findings* are not required for the Court to rule on the pending motions. However, in order to simplify the outstanding controversies, the Court includes herein other *Factual Findings* that it found to be undisputed and will be relevant during trial.

6. Mr. García-Torres testified that he performs the duties of a Captain on LA NENA II about 30-40 times a year. *See id.*

7. At the time of the incident, Mr. García-Torres resided about three (3) minutes travel time by car from LA NENA II's berth. *See id.*, p. 23.

8. The LA NENA II is a Baja passenger vessel that bears official number PR1502HH, of 6 gross tons; 31.0 feet in overall length; fiberglass hull; 160 horsepower; built in 1993, and duly inspected and authorized to navigate by the United States Coast Guard. *See* Docket No. 5, ¶8; *see also Certificate of Inspection*, Exhibit No. 1 of the instant *Opinion and Order.*

9. LA NENA II is less than 100 gross tons, and is considered a "small passenger vessel" subject to inspection by the United States Coast Guard, pursuant to 46 C.F.R §2.01-7 (Table 2.01-7(a), Column 3 (ii)(A)) and §176.103. *See* Exhibit No. 1 of the instant *Opinion and Order.*

10. A Certificate of Inspection ("COI") was issued on October 5, 2012 by the United States Coast Guard as to LA NENA II, official no. PR1502HH. The duration of said document was from October 5, 2012 and October 5, 2017. *See id.*

11. The LA NENA II, as described in the *Certificate of Inspection* produced by the United States Coast Guard, qualifies the vessel as a harbor vessel limited to a specific route:

> "Route Permitted and Conditions of Operation:
> --Lakes, Bays, and Sounds--
> Bahia de la Parguera Between Punta Montalva and Punta Tocon, Puerto Rico, not more than one thousand (1000) feet from land. ..."

*See id.*

12. The manning requirements stated in the *Certificate of Inspection* of LA NENA II requires that she be operated by one Master and one Deckhand when carrying passengers. *See id.*

13. According to the *Certificate of Inspection*, LA NENA II "vessel's voyages are limited to no more than thirty (30) minutes in duration." *See id.*

14. The *Certificate of Inspection* of LA NENA II requires that the vessel be manned by two (2) crew members. *See* Docket No. 178, Exhibit 14, p. 118; *see also* Exhibit No. 1.

15. No more than thirty-two (32) persons in total are allowed at LA NENA II during a voyage. *See* Exhibit No. 1.

16. The *Certificate of Inspection* requires that one of the two crew members in the vessel during a voyage be a deckhand. *See* Docket No. 178, Exhibit 14, p. 118; *see also* Exhibit No. 1.

17. Mr. José Hernández-Zapata, Captain of LA NENA II during the subject voyage, is aware of the fact that a deckhand is a licensed Coast Guard Captain. *See id.*, p. 119.

18. Prior to the commencement of the subject voyage, Mr. Hernández-Zapata was aware that Juan Pablo Quiñones Espinosa (hereinafter, "Pablo "the swimmer""), the other crewmember at LA NENA II during the subject voyage, did not have a Captain's License or certification for any type of seaman's position. *See id.*, pp. 82-83.

19. Guardian Insurance Company (hereinafter, "Guardian") is an insurance company duly authorized to do business in Puerto Rico. *See Complaint* in consolidated case no. 17-2145 (DRD), Docket No. 1, and *Answer to Complaint,* Docket No. 7, ¶ 10, respectively.

20. Guardian does not have an ownership interest on the insured vessel LA NENA II. *See* consolidated case no. 17-2168 (DRD), Docket No. 5, ¶ 7.

21. Guardian issued a *Commercial Yacht Policy*, *Policy No. CYP 00003-16*, under the name of Mr. García-Torres for the watercraft LA NENA II. *See Commercial Yacht Policy 00003-16*, Exhibit

2 of the instant *Opinion and Order*; *see also Complaint* in consolidated case no. 17-2145 (DRD), Docket No. 1 and *Answer to Complaint*, Docket No. 7, ¶ 16, respectively.

22. The Policy issued by Guardian has a limit of $1,000,000.00 for third-party liability claims. *See Commercial Yacht Policy 00003-16*, Exhibit No. 2 of the instant *Opinion and Order*.

23. Guardian issued Insurance *Policy No. CYP 00003-16* to Mr. García-Torres, with a policy period from August 16, 2016 to August 16, 2017[9]. *See id.* at GIC 31-48.

24. The Captain of LA NENA II at the time of the collision incident, Mr. Hernández-Zapata, is also insured under the *Commercial Yacht Policy* issued by Guardian. *See id.* at 7, 10; *see also Deposition of Captain Hernández Zapata*, Docket No. 175, Exhibit 4, pp. 237-238.

25. Mr. Hernández-Zapata does not have an ownership interest on the insured vessel LA NENA II. *See Complaint* in consolidated case no. 17-2168 (DRD), Docket No. 5, ¶ 7.

26. Section D, Third Party Liability Coverage, of the Policy issued by Guardian provides in relevant part: "We will pay damages for bodily injury or property damage for which any 'covered person' becomes liable through the ownership, maintenance, or use of the 'insured watercraft' …We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. Our obligation to settle or defend ends when the amount we pay for damages equals our limit of liability for this coverage." *See* Exhibit 2 of the instant *Opinion and Order.*

27. Section D, Third Party Liability Coverage of the Policy provides the following as to Guardian's Limit of Liability: "The limit of liability shown for Third Party Liability on the Coverage Section Page is our maximum limit of liability under this Section. This the most we will pay, regardless

---

[9] The incident subject of the instant suit was on July 25, 2017, well within the policy period.

of the number of insured persons, claims made, or watercraft involved in any one accident, or series of accidents arising out of the same event." *See id.*

28. The *Petition-Complaint* on Civ. No. 17-2168 (DRD), and the claim for exoneration from or limitation of liability asserted therein, was filed not only on behalf of Plaintiffs-petitioners, but also on behalf of Guardian Insurance Company, Inc. as their liability insurers and underwriters, shareholders, managers and agents that would be entitled to exoneration from or limitation of liability to the same extent as the owners, and their liability in the premises, if any, shall, accordingly, not exceed that of the liability of the plaintiffs-petitioners, if any. See Docket No. 5, ¶ 20 in consolidated case no. 17-2168 (DRD).

29. The master of LA NENA II, Mr. Hernández-Zapata, has worked for Mr. García-Torres for the past five (5) years. *See Captain Hernández-Zapata's Deposition*, Docket No. 200, Exhibit 5, p. 12.

30. Mr. Hernández-Zapata worked for Cancel Boats prior to Torres Boats, since 2005-2006. *See id.,* p. 13.

31. Mr. García-Torres, the owner of LA NENA II, conducted the day trips around La Parguera while Mr. Hernández-Zapata acted as Captain during the night trips to the Bioluminescent Bay. *See Mr. García-Torres' Deposition*, Docket No. 200, Exhibit 1, p. 4.

32. Mr. Hernández-Zapata made four (4) trips per night during the summer high season and 1-2 trips during the rest of year. *See Captain Hernández-Zapata's Deposition*, Docket No. 200, Exhibit 5, p. 25.

33. LA NENA II was not equipped with GPS, radar, fathometer or radio for the subject voyage. *See Mr. García-Torres' Deposition*, Docket No. 178, Exhibit 15, pp. 52-53; *see also Captain Hernández-Zapata's Deposition*, Docket No. 178, Exhibit 14, pp. 136-137.

34. Mr. García-Torres testified that LA NENA II had a compass on the top of the console and that it has always been in the same place. *See Mr. García-Torres' Deposition*, Docket No. 178, Exhibit 15, pp. 59-60.

35. Mr. Hernández-Zapata testified that he first noticed the compass light was not working approximately one (1) month before the voyage. He informed the owner of LA NENA II about the lack of compass light, the owner then said it would be repaired but as of July 25, 2017, date of the incident, it had not been repaired and he nonetheless departed to the Bioluminescent Bay. *See Captain Hernández-Zapata's Deposition*, Docket No. 178, Exhibit 14, p. 202-204.

36. According to Mr. Hernández-Zapata, he navigates visually and avoids looking at his cellphone and answering phone calls as he is "watching a compass and oil, pressure and temperature clocks, gauges" which are located in front of him. *See id.*, p. 133.

37. Accordingly, Mr. Hernández-Zapata maintains his visual attention exclusively concentrated on those gauges on the panel and looking towards "the front part." *See id.*, p. 134.

38. In order to navigate, Mr. Hernández-Zapata uses visual navigation and a compass. *See id.*, p. 136.

39. Mr. Hernández-Zapata only uses a compass while navigating as LA NENA II does not have anything, i.e., GPS or a SAP Map, it only has a compass. *See id.*

40. Mr. Hernández-Zapata testified that "from the time [they] leave the dock there is an established route that [] captains have. Since La Parguera has a lot of reefs, [he] does that along with or in conjunction with the compass and [they] also use what [captains] call silhouettes of the hills, the marks of the hills." *See id.*, p. 135.

**B.    M/V ANDREA GABRIELA**

41. Third-Party Defendant Ricardo Vélez-Amador was the operator of ANDREA GABRIELA, a Hydra Sport 33' pleasure craft, official number PR5158CC, on the evening of July 25th, 2017. *See Deposition of Gabriela Agulló*, Docket No. 200, Exhibit. 2, p. 60.

42. The owner of the ANDREA GABRIELA is Third-Party Defendant Gabriela Agulló-Pagán. *See Deposition Mr. Vélez-Amador*, Docket No. 200, Exhibit 3, p. 46; *see also Deposition of Gabriela Agulló*, Docket No. 200, Exhibit 2, p. 10.

43. Ms. Agulló-Pagán purchased the ANDREA GABRIELA around 2017. *See Deposition of Mr.Vélez-Amador*, Docket No. 200, Exhibit No. 3, p. 18.

44. ANDREA GABRIELA is registered in Ms. Agulló-Pagán's name before the Puerto Rico Department of Natural Resources. *See id.*, p. 46; *see also Deposition of Gabriela Agulló*, Docket No. 200, Exhibit No. 2, p. 10.

45. Prior to July 25, 2017, Ms. Agulló Pagán only operated the ANDREA GABRIELA at the time of purchase of the vessel in the continental United States. *See id.*, pp. 26-27.

46. Ms. Agulló-Pagán's navigation license was issued by the Puerto Rico Department of Natural Resources on August 3rd, 2017. *See id.*, p. 16.

## C.    THE CASUALTY

47. On the evening of July 25, 2017, the LA NENA II was engaged in the carriage of twenty-eight (28) passengers by sea on a two-way voyage from La Parguera village to the nearby Bioluminescent Bay. *See* Docket No. 5, ¶¶ 9, 13 in consolidated civil case no. 17-2168 (DRD).

48. On the evening of July 25, 2017, while LA NENA II was engaged in the carriage of passengers to the Bioluminescent Bay, a Deckhand was not aboard. *See* Docket No. 77, ¶ 9.

49. The night of the accident, namely, July 25th, is Constitution's Day, is a National Holiday in Puerto Rico.

50. On the night of July 25, 2017, Mr. Hernández-Zapata knew that there would be a lot of traffic in the area. *See* Docket No. 178, Exhibit 14, p. 113.

51. LA NENA II was involved in a casualty in the navigable waters of the United States during the evening of July 25, 2017, specifically, a collision with the motor vessel ANDREA GABRIELA. *See id.*

52. Mr. Hernández-Zapata knew well that the Bioluminescent Bay is a popular touring location for pleasure craft boaters who sometimes follow behind professional tour boats such as LA NENA II as reaching the Bioluminescent Bay is not an easy undertaking. *See Captain Hernández-Zapata's Deposition*, Docket No. 178, Exhibit 14, p. 114.

53. According to Mr. Hernández-Zapata, he became aware that Reyniel Ortiz would not be joining him for the trip of July 25, 2017, when he arrived on that same day to the work area, at approximately 6:30 or 7:00 p.m. *See Captain Hernández-Zapata's Deposition*, Docket No. 219, Exhibit 2, p. 80.

54. The person who normally worked as Deckhand with Mr. Hernández-Zapata was Reyniel Ortiz. At the time of Incident, Reyniel Ortiz held a Captain's license but for reasons unknown he was not willing to work aboard LA NENA II on the night of the subject voyage. *See Captain Hernández-Zapata's Deposition*, Docket No. 178, Exhibit 14, pp. 76-77.

55. Mr. Hernández-Zapata held a 50-ton Captain license when the incident occurred. *See id.,* p. 82.

56.  Once Mr. Hernández-Zapata learned that Captain Ortiz was not available to work on the date of the incident, he called Pablo "the swimmer" to work on LA NENA II. *See id.*, pp. 76-77.[10]

57. Before calling Pablo "the swimmer", Mr. Hernández-Zapata called owner Mr. García-Torres to advise him that Captain Ortiz was unavailable. In that telephone conversation Mr. García-Torres authorized Mr. Hernández-Zapata to call Pablo "the swimmer" to work on LA NENA II. *See id.*, pp. 81-82.

58. Pablo "the swimmer" was onboard the LA NENA II on that evening.  His duties were only as a swimmer, that is, to jump into the water to activate the water's bioluminescence. *See García-Torres' Deposition*, Docket No. 200, Exhibit 1, p. 23; *see also Captain Hernández-Zapata's Deposition*, Docket No. 200, Exhibit 5, p 79.

59. According to Mr. García-Torres's testimony, Pablo "the swimmer" works on the boat as a swimmer but has no salary. He works based on tips that people give him. *See* Docket No. 178, Exhibit 15, p. 14.

---

[10] Pablo "the swimmer" "does not have a Captain's license or certification for any type of seaman's position." *See* Factual Finding ¶ 18, p. 7.

60. Mr. García-Torres did not perform a background check on Pablo "the swimmer" before hiring him. *See id.*, p. 15.

61. Pablo "the swimmer"'s only responsibility with Torres Boat Rental was to be a swimmer whose task was to jump into the water and swim once the vessel arrived at the Bioluminescent Bay. *See id.*, p. 23.

62. Pablo "the swimmer" was not provided any written documents as to his duties, only oral instructions from Mr. García Torres that his duty was to, as a swimmer, jump in the water. *See id.*, p. 41.

63. Mr. García-Torres testified that at the time of the accident, there was no Deckhand at the vessel. "The only one there was the swimmer." *See id.*, p. 62.

64. According to Mr. Hernández-Zapata, Pablo "the swimmer" had to work at LA NENA II in five or six occasions prior thereto because the person that they had at that time to work was not willing to work on that day. *See* Docket No. 178, Exhibit 14, p. 77.

65. According to Mr. Hernández-Zapata, Pablo "the swimmer" was approximately 27 or 28 years old and lived near Yauco, Puerto Rico. *See id.*, p. 78.

66. At the time of the incident, LA NENA II did not have a manual or set of instructions in writing that described the duties of the Master, Deckhand, and swimmer. *See Captain Hernández-Zapata's Deposition*, Docket No. 178, Exhibit 14, p. 178.

67.  Although no written instructions existed, Mr. Hernández-Zapata described the customary duties of a deckhand when that position was filled by a person who held a Captain's license, such as Reyniel Ortiz as follows:

    a.  The person is a Captain while at the same time serves the function of a Deckhand;

    b.  he is always near the Captain, observes along the route and ties up the vessel when it arrives at the dock;

    c.  he would be observing the rout and possibly obstacles coming to the vessel doing practically the same thing as the Captain;

    d.  he would be watching the route, while the Captain would be focused visually on the gauges on the panel.

*See id.*, pp. 173-174.

68. According to Mr. Hernández-Zapata, it was very dark in the area on the night of the incident.

*See Captain Hernández-Zapata's Deposition*, Docket No. 219, Exhibit 2, p. 171.

69. The subject voyage began at 9:35 p.m. *See Mr. García-Torres' Deposition*, Docket No. 178, Exhibit 15, pp. 84-85.

70. During the voyage to the Bioluminescent Bay at a point near the Magueyes Cay, the LA NENA II and ANDREA GABRIELA collided. The ANDREA GABRIELA vessel stroke the LA NENA II vessel on her port aft quarter. The LA NENA II was travelling at around five or six knots. *See Captain Hernández-Zapata's Deposition*, Docket No. 200, Exhibit 5, p. 153; *see also Captain Hernández-Zapata's Deposition – Day 2*, Docket No. 200, Exhibit 8, pp. 185, 213, 236; *Juan Pablo Quiñones' Deposition*, Docket No. 200, Exhibit 4, pp. 37-38, 46.

71. Mr. Hernández-Zapata had never been involved in a vessel collision before. *See Captain Hernández-Zapata's Deposition*, Docket No. 200, Exhibit 5, p. 54.

72. Mr. García-Torres was not present at the time of the accident. *See García-Torres' Deposition*, Docket No. 200, Exhibit 1, p. 55.

73. Mr. García-Torres was informed of the collision at approximately 10:30-11:00 p.m. that evening while he was at home sleeping. *See Mr. García-Torres' Deposition*, Docket No. 178, Exhibit 15, p. 66.

74. The ANDREA GABRIELA had three (3) 250hp engines on the vessel outboard motors and was carrying eleven (11) persons. *See Mr. Vélez Amador's Deposition – Day Two*, Docket No. 200, Exhibit 7, p. 208.

75. The ANDREA GABRIELA's port engine was not operating during the July 25, 2017, voyage. *See Mr. Vélez Amador's Deposition – Day Two*, Docket No. 200, p. 220.

76. The master of the ANDREA GABRIELA was sitting on his left foot while navigating the vessel. *See id.* p. 223.

77. ANDREA GABRIELA's GPS and radar were not working when the vessel was purchased. *See Mr. Vélez Amador's Deposition – Day One*, Docket No. 200, Exhibit 3, p. 51; *see also Ms. Gabriela Agulló's Deposition*, Docket No. 200, Exhibit 2, p. 22.

78. Ms. Agulló-Pagán did not instruct Mr. Vélez-Amador to replace GPS and radar units prior to accident. *See Ms. Gabriela Agulló's Deposition*, Docket No. 200, Exhibit 2, p. 23.

79. ANDREA GABRIELA's GPS was not working at time of accident.  *See* Mr*. Vélez Amador's Deposition – Day One*, Docket No. 200, Exhibit 3, p. 52.

80. Mr. Vélez-Amador did not to obtain ANDREA GABRIELA's manual after purchase. *See id.*, p. 85.

81. Ms. Agulló-Pagán did not have a duly issued navigation license at the time of the casualty. *See* Docket No. 154.

82. Mr. Vélez-Amador was at the helm of the ANDREA GABRIELA at the time of the casualty. *See Mr. Vélez Amador's Deposition – Day Two*, Docket No. 200, Exhibit 7, p. 222.

83. Mr. Vélez-Amador was the only person that operated the ANDREA GABRIELA on day of accident since he was the one authorized to do so. *See Ms. Gabriela Agulló's Deposition*, Docket No. 200, Exhibit 2, p. 60.

84. Ms. Agulló-Pagán, as the owner, entrusted the operation of the ANDREA GABRIELA to Mr. Vélez-Amador. *See id.,* p. 60.

85. Mr. Vélez-Amador has never seen operating manual for the vessel. *See Mr. Vélez Amador's Deposition – Day Two*, Docket No. 200, Exhibit 7, p. 199.

86. Mr. Vélez-Amador did not have a duly issued navigation license at the time of the casualty, even though the first time he operated ANDREA GABRIELA was in late June 2017. *See* Docket No. 155; *see also Mr. Vélez Amador's Deposition – Day One*, Docket No. 200, Exhibit 3, pp. 115-116, 122-124, 126.

87. Mr. Vélez-Amador claims to have designated all passengers of the ANDREA GABRIELA as lookouts. *See Mr. Vélez Amador's Deposition – Day Two*, Docket No. 200, Exhibit 7, p. 209.

88. Mr. Vélez-Amador claims that none of the ANDREA GABRIELA passengers refused or declined to be lookouts. *See id.*, p. 319.

89. No one onboard ANDREA GABRIELA saw the LA NENA II prior to accident. *See Ms. Gabriela Agulló's Deposition*, Docket No. 200, Exhibit 2, pp.76-77, 95.

90. Ms. Agulló-Pagán did not provide Mr. Vélez-Amador any instruction on how to operate the ANDREA GABRIELA on the night of the casualty. *See Mr. Vélez Amador's Deposition – Day Two*, Docket No. 200, Exhibit 7, p. 222.

91. Mr. Vélez-Amador had his cellphone placed on top of ANDREA GABRIELA's console on the night of the accident. *See id.*, pp. 225-226.

92. Mr. Vélez-Amador did not use ANDREA GABRIELA's horn at any time on the night of the accident. *See id.*, pp. 238.

93. At no time prior to the collision did Mr. Vélez-Amador see LA NENA II.  His first notice of the latter was with impact. *See id.*, pp. 239-240.

94. At no time prior to the collision did Mr. Vélez-Amador take evasive action onboard the ANDREA GABRIELA. *See id.*, p. 240.

95. Upon impact, ANDREA GABRIELA turned left and tilted substantially. *See id.*, p. 241.

96. Upon impact, Mr. Vélez-Amador saw something white that went by very quickly by the right side of Ms. Agulló. *See id.*, p. 243.

97. The impact was so strong that it moved Mr. Vélez-Amador from his seat, threw him to one side, even when he had both hands-on wheel and lost grip on it. *See id.*, pp. 244-245.

98. ANDREA GABRIELA's starboard propeller, and possibly her center propeller, suffered damages when they hit LA NENA II on the port side. *See id.*, pp. 329-330.

99. The claims alleged against the LA NENA II and the Plaintiffs-Petitioners are in excess of the value of the LA NENA II, plus its pending freight, at the end of the voyage on July 25th, 2017. *See* Docket No. 5, ¶ 13 in consolidated case no. 17-2168 (DRD).

100.    The LA NENA II was damaged as a result of the subject incident.  The Court on consolidated case no. 17-2168 (DRD) approved the amount of six thousand dollars ($6,000.00 USD) as *ad interim* stipulation of value of the subject vessel, on July 25th, 2017, the date of the incident which gave rise to this exoneration and limitation action, and at the end of the voyage upon which it was engaged.  *See* consolidated case no. 17-2168 (DRD), Docket No. 17.

101.    The collision between LA NENA II was investigated by the United States Coast Guard. *See* Docket No. 70, ¶ 10.

102.    During the investigation, the United States Coast Guard issued a "Notice of Violation" against the person who acted as Master of LA NENA II during the voyage to Bioluminescent Bay described above. *See id.,* ¶ 11; *see also* Exhibit No. 3 of the instant *Opinion and Order.*

103.    The Notice of Violation issued by the United States Coast Guard on December 5, 2017 against LA NENA II was for a violation of regulation 46 CF 176.100(b) for "failure to be in full compliance with terms of COI when operating with passengers on board." A penalty for $750.00 was imposed for the violation and the incident was described as follows: "LA NENA II was underway with 28 passengers one master and no qualified deckhand as required by their COI." *See id.*

104.    On December 5, 2017, the United States Coast Guard issued a *Warning in Lieu of Suspension and Revocation Proceedings* against the person who was the Master of LA NENA II during the voyage to Bioluminescent Bay subject of the instant suit. *See* Exhibit No. 4 of the instant *Opinion and Order.*

105.    The *Warning in Lieu of Suspension and Revocation Proceedings* was issued for a violation of law or regulation (46 CFR 5.33) stating that "[w]hile serving as Master aboard said vessel on 25 July 2017, you got underway without a qualified deckhand, failing to be in full compliance with the terms of the COI when operating with passengers on board in violation of 46 CFR 176.100(b). *See id.*

106.     The person who was the Master of LA NENA II during the voyage to Bioluminescent Bay

accepted the *Warning* on December 26, 2017 by signing his name and circling his acceptance.

*See id*; *see also* Docket No. 77, ¶ 14.

**III.     STANDARD OF REVIEW MOTION FOR SUMMARY JUDGMENT (FED. R. CIV. P. 56)**

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil

Procedure, which entitles a party to judgment if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable

jury could resolve the point in favor of the non-moving party."  *See Johnson v. Univ. of P.R.*, 714

F.3d 48, 52 (1st Cir. 2013); *Prescott v. Higgins*, 538 F.3d 32, 40 (1st Cir. 2008) (citing *Thompson v.

Coca–Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248-250 (1986); *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

The analysis with respect to whether or not a "genuine" issue exists is directly related to the

burden of proof that a non-movant would have in a trial.  "[T]he determination of whether a

given factual dispute requires submission to a jury must be guided by the substantive evidentiary

standards that apply to the case." *Liberty Lobby, Inc.*, 477 U.S. at 255 (applying the summary

judgment standard while taking into account a higher burden of proof for cases of defamation

against a public figure).  In order for a disputed fact to be considered "material" it must have the

potential "to affect the outcome of the suit under governing law." *Sands v. Ridefilm Corp.*, 212

F.3d 657, 660–661 (1st Cir. 2000) (citing *Liberty Lobby, Inc.*, 477 U.S. at 247–248); *Prescott*, 538

F.3d at 40 (1st Cir. 2008) (citing *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The objective of the summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (citing the advisory committee note to the 1963 Amendment to Fed. R. Civ. P. 56(e)). The moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact on the record. *Shalala*, 124 F.3d at 306. Upon a showing by the moving party of an absence of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate that a trier of fact could reasonably find in his favor. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The non-movant may not defeat a "properly focused motion for summary judgment by relying upon mere allegations," but rather through definite and competent evidence. *Maldonado–Denis v. Castillo Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994). The non-movant's burden thus encompasses a showing of "at least one fact issue which is both 'genuine' and 'material.'" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990); *see also Suarez v. Pueblo Int'l.*, 229 F.3d 49, 53 (1st Cir. 2000) (stating that a non-movant may shut down a summary judgment motion only upon a showing that a trial-worthy issue exists). As a result, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." *Liberty Lobby, Inc.*, 477 U.S. at 247–248. Similarly, summary judgment is appropriate where the nonmoving party rests solely upon "conclusory allegations, improbable inferences and unsupported speculation." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996); *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

When considering a motion for summary judgment, the Court must "draw all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable

21

inferences, and unsupported speculation." *Smith v. Jenkins*, 732 F.3d 51, 76 (1st Cir. 2013) (reiterating *Shafmaster v. United States*, 707 F.3d 130, 135 (1st Cir. 2013)). The Court must review the record as a whole and refrain from engaging in the assessment of credibility or the gauging the weight of the evidence presented. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (*quoting Anderson*, 477 U.S. at 250–51).

Summarizing, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (Emphasis provided). *See* Fed. R. Civ. P. 56(a).

### III.    LEGAL ANALYSIS

#### A.    *Shipowner's Exoneration and/or Limitation of Liability*

The controversy before the Court arises from the *Shipowner's Limitation of Liability Act* ("the Act"), 46 U.S.C. § 181 *et seq.*, which "allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446 (2001). The Act serves "to limit the liability of vessel owners to their interest in the adventure ... and thus to encourage shipbuilding and to induce capitalists to invest money in this branch of industry." *British Transp. Comm'n v. United States*, 354 U.S. 129, 133 (1957) (citations omitted). Additionally, the Act "had the purpose of putting American shipping upon an equality with that of other maritime nations that had their own limitation acts." *Lewis*, 531 U.S. at 446-47 (*quoting*

*The Main v. Williams*, 152 U.S. 122, 128 (1894)) (internal quotation marks omitted). For the purpose of exoneration and limitation of liability, "the term 'owner' includes a charterer that mans, supplies, and navigates a vessel at the charterer's own expense or by the charterer's own procurement." 42 U.S.C § 30501.

"[T]he defense of limitation of liability for purposes of the Puerto Rico direct action statute, 26 L.P.R.A. § 201 et seq., is a defense which is personal to the shipowner and is not available to the vessel's insurer." *Torres v. Interstate Fire & Cas. No.*, 275 F.Supp. 784, 789 (D.P.R. 1967). Under Puerto Rico Law, the direct-action statute "provides a plaintiff with a substantive claim against an insurer separate and distinct from any claim which the plaintiff may have against the insured." *De Leon Lopez v. Corporación Insular de Seguros*, 931 F.2d 116, 122 (1st Cir. 1991); *see* P.R. Laws Ann. Tit. 26 § 2003); *see also Fraticelli v. St. Paul Fire & Marine Ins. Co.*, 375 F.2d 186 (1st Cir. 1967)(holding that the Puerto Rico direct action statute created a separate cause of action, hence, a person may bring suit directly against the insurer.) More importantly, a party is entitled to file a direct action against the insurer "even if the shipowner has filed a limitation of liability proceeding" pursuant to Puerto Rico law. *Ema v. Compagnie Generale Trasatlantique*, 353 F.Supp. 1286, 1290-91 (D.P.R. 1972).

In order to determine whether a shipowner is entitled to limitation or exoneration under *the Act* a two-step process is employed: "[f]irst, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976). It is important to note that, "[k]nowledge or privity of any fact or act causing the accident is not enough for denial

of limitation; it is only knowledge or privity of negligent acts or unseaworthy conditions which

trigger a denial of limitation." *Id.*

Initially, the burden of establishing negligence is upon claimants, however, once this

requirement is met, the burden shifts to the shipowner to demonstrate lack of privity or

knowledge. *Id.* "If the owner meets this burden, the court caps the owner's liability at the value

of the vessel and pending freight, resolves the claims, and apportions the fund." *In re Aramark*

*Sports & Ent. Servs.*, LLC, 831 F.3d 1264, 1273 (10th Cir. 2016).

Privity or knowledge is usually defined as follows:

 As used in the statute, the meaning of the words "privity or knowledge,"
evidently, is a personal participation of the owner in some fault, or act of
negligence, causing or contributing to the loss, or some personal knowledge or
means of knowledge, of which he is bound to avail himself of a contemplated loss,
or a condition of things likely to produce or contribute to the loss, without
adopting appropriate means to prevent it. There must be some personal
concurrence, or some fault or negligence on the part of the owner himself, or in
which he personally participates, to constitute such privity, within the meaning of
the Act, as will exclude him from the benefit of its provisions.

*Petition of M/V Sunshine, II*, 808 F.2d 762, 763–64 (11th Cir. 1987); *see Lord v. Goodall, Nelson &*

*Perkins S.S. Co.,* 15 F.Cas. 8,506 (C.C.Cal.1877). "It is the owner's duty to use due and proper care

to provide a competent master and crew and to see that the ship is seaworthy; any loss occurring

by reason of fault or neglect in these particulars is within his privity." *Tug Ocean Prince, Inc. v.*

*United States*, 584 F.2d 1151, 1155 (2d Cir. 1978). In fact, "[t]he burden to prove seaworthiness

and the exercise of due diligence to make the ship seaworthy is upon the vessel owner or

operator." *Id.*

Therefore, in order to deny limitation to an owner, "[t]he privity or knowledge must be

actual and not merely constructive. It involves a personal participation of the owner in some fault

or act or negligence causing or contributing to the injury suffered. There must be some fault or negligence on his part or in which he in some way participates." *Petition of Bloomfield S.S. Co.*, 422 F.2d 728, 736 (2d Cir. 1970).

      *i.*      ***Pennsylvania Rule***

Under the doctrine called *Pennsylvania Rule*, when a ship at the time of a collision is in violation of a rule and/or safety statutes and regulations intended to prevent such casualties, a burden shifting regime is activated. The Supreme Court applied doctrine, holds as follows:

> The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*The S.S. Pennsylvania v. Troop*, 86 U.S. 125, 136, 22 L. Ed. 148 (1873)(emphasis ours). Therefore, "[i]f a plaintiff can establish both that the defendant breached a statutory duty and that the breach is relevant to the casualty in question, the defendant assumes the burden of proving that its breach could not have caused plaintiff's damages." *Pan Am. Grain Mfg. Co. v. Puerto Rico Ports Auth.*, 295 F.3d 108, 115–16 (1st Cir. 2002). To that effect, pursuant to the *Pennsylvania Rule*, "the burden of proof, including the burden of persuasion, is effectively shifted as to the causation issue, once it is established that a vessel is guilty of violating a statute or a regulation." § 14:4. Presumptions, burden of proof, and evidence, 2 Admiralty & Mar. Law § 14:4 (6th ed.) However, it is important to note that, the rule "is not a rule of liability, but shifts the burden of proof as to causation, however, said burden "is not insurmountable." *Orange Beach Water, Sewer, & Fire Prot. Auth. v. M/V Alva*, 680 F.2d 1374, 1380–81 (11th Cir. 1982). In fact, the First Circuit has

emphasized that it would be difficult to believe that "The Pennsylvania intended to establish as a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision no matter how speculative, improbable or remote. " *Seaboard Tug & Barge, Inc. v. Rederi AB/Disa*, 213 F.2d 772, 775 (1st Cir. 1954).

The *Pennsylvania Rule* comes into play whenever there is a 'violation of a statutory rule intended to prevent collisions. The rule applies to collisions of vessels underway, allisions, collisions between a vessel and a stationary object, and vessel strandings. Although the rule speaks of a statutory violation, it is equally applicable to violations of regulations." § 14:4. Presumptions, burden of proof, and evidence, 2 Admiralty & Mar. Law § 14:4 (6th ed.).

In turn, "[f]or the Pennsylvania rule to apply, three elements must exist: (1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *Union Pac. R. Co. v. Kirby Inland Marine, Inc. of Mississippi*, 296 F.3d 671, 674 (8th Cir. 2002).

Notwithstanding, the above stated, "[c]ourts have held that application of The *Pennsylvania Rule* is 'limited to the violation of a statute intended to prevent the catastrophe which actually transpired.' In addition, the Second Circuit has held that 'The Pennsylvania Rule does not apply where proof that the legal obligation was breached does not lead 'naturally and logically' to the conclusion that the breach caused the injury.' *Poulis-Minott v. Smith*, 388 F.3d 354, 365 (1st Cir. 2004)(*quoting Wills v. Amerada Hess Corp.*, 379 F.3d 32, 43 (2d Cir. 2004)." "Since then, the courts, including this court, have held that a plaintiff must establish a relationship

between the regulatory violation and the injury in order to invoke the Pennsylvania Rule." *Id.* at 364 (*quoting In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105, 115 (3d Cir.1996)). Therefore, in order for plaintiff to be afforded the *Pennsylvania Rule*, he must demonstrate that there is a link between the statutory violation and the casualty, namely, the statutory violation had some relation to the accident.

### ii.    Home Port Doctrine

The *Home Port Doctrine* has been established in order to deny limitation of liability in instances where the vessel seeking limitation, the owner and the casualty all occur in local waters of the home port. According to the East District of New York, the nature of a voyage in a home port "suggests the opportunity to more detailed control by the owner and the responsibility of its executives, who were virtually on the scene, to supervise the vessel's ongoing seaworthiness more closely than if the vessel were in high seas." *Haney v. Miller's Launch, Inc.*, 773 F. Supp. 2d 280, 290 (E.D.N.Y. 2010); *see also In re J.R. Nicholls, LLC*, 2012 WL 1802588, Texas (Houston Div.) (holding that when a vessel is operated within the home port on the time of the incident, and "the captain and crew were in daily, close contact with ownership and supervisory personnel," it is not the instance "[w]here the purpose of the Act would be served by a limitation of liability.")

The duty of the Court is to determine whether Plaintiffs-Petitioners are subject to a Limitation or Exoneration of Liability pursuant to the *Shipowner's Limitation of Liability Act*. As previously explained, the Court must determine whether the uncontested material facts are sufficient for Claimants to establish negligence or conditions of unseaworthiness, and consequently, whether the shipowner to demonstrate lack of privity or knowledge as to said negligence or conditions of unseaworthiness, or whether, in the opposite, Plaintiffs-Petitioners

27

can demonstrate that there was no negligence or conditions of unseaworthiness, and even if there was, Mr. García-Torres, owner of LA NENA II had no knowledge of said circumstances. However, it is not knowledge of any fact but knowledge or privity of negligent acts or unseaworthy conditions which will trigger a denial of limitation.

Claimants essentially argue that, "the Court is faced with the uncontroverted fact that the vessel violated her *Certificate of Inspection* by carrying passengers without proper manning, and, second, the uncontroverted fact that both statute and regulation demanded that LA NENA II not be operated without the required crew compliment. Based on these two uncontested material facts, Claimants understand that the collision would never have occurred had the vessel owner not violated the law by the mere act of leaving the dock." Docket No. 172 at 4.

In turn, Plaintiffs-Petitioners, argue that [t]he factors contributing to the collision were the fact that her master lacked the proper navigation license, the obstructed visibility of the master of the ANDREA GABRIELA, the operation of the M/V ANDREA GABRIELA in a negligent manner endangering life and property, and the violation of Rule 13 of the International Navigation Rules.[11]" Docket No. 199 at 8. It is further added, that "[t]he ANDREA GABRIELA should not have been in the water on July 25, 2017, since neither her master, nor her owner held any navigation licenses. <u>This was a clear breach of federal and state navigation laws and regulations</u>." *Id.*

---

[11] (a) Notwithstanding anything contained in the Rules of Part B, Sections I and II, any vessel overtaking any other shall keep out of the way of the vessel being overtaken. (b) A vessel shall be deemed to be overtaking when coming up with another vessel from a direction more than 22.5 degrees abaft her beam, that is, in such a position with reference to the vessel she is overtaking, that at night she would be able to see only the sternlight of that vessel but neither of her sidelights. (c) When a vessel is in any doubt as to whether she if overtaking another, she shall assume that this is the case and act accordingly. (d) Any subsequent alteration of the bearing between the two vessels shall not make the overtaking vessel a crossing vessel within the meaning of these Rules or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

It strikes the Court's attention that Plaintiffs-Petitioners assert that the ANDREA GABRIELA should not have been in the water on the day of the subject voyage as it was in violation of federal regulations, yet, LA NENA II was prohibited from navigating without the two (2) required crew members, namely, a Master and a Deckhand, nonetheless, the vessel still departed to the Bioluminescent Bay with Mr. García-Torres' authorization, in clear violation of federal regulations and the *Certificate of Inspection*. However, in order to properly determine whether an exoneration or limitation of liability as to the owner of LA NENA II is applicable, the Court must discuss all elements that were present before the subject voyage.

There is no question that Mr. García-Torres is the registered owner of LA NENA II who resides in Lajas, Puerto Rico, about three (3) minutes travel time by car from LA NENA II's berth. *See* Factual Findings Nos. 2, 3, 7. It is undisputed that Mr. García-Torres performs the duties of Captain of LA NENA II about 30-40 times per year, particularly during day trips, as he has held a Master's license for the past twenty-two (22) years. *See* ¶ 4, 6, 31.

Furthermore, a *Certificate of Inspection* was issued on October 5, 2012 by the United States Coast Guard as to LA NENA II, official no. PR1502HH which was valid until October 5, 2017, namely, three (3) months after the subject voyage. *See* ¶ 10. LA NENA II is a harbor vessel which manning requirements included that she be operated by one Master and one Deckhand when carrying passengers. *See* ¶ 12. Accordingly, there is no question that the *Certificate of Inspection* required that the vessel be manned by two (2) crew members, and that one of the crew members be a Deckhand. *See* ¶¶ 14, 16. Mr. Hernández-Zapata, Captain of LA NENA II when the incident occurred, was aware that a Deckhand is a licensed Coast Guard Captain. *See* ¶ 17, 24. He was also aware that the person called to substitute the Deckhand, Reyniel Ortiz, due to his

unavailability, did not possess a Captain's license or certification for any type of seaman's position, as he was a swimmer. *See* ¶ 18. Yet, there was no Deckhand at the vessel as required, only a swimmer. *See* ¶ 63.This was not an isolated event, as it is undisputed that Pablo "the swimmer" had to work for LA NENA II in five or six occasions prior thereto because the person that had to serve as Deckhand was not available to work. *See* ¶ 64.

Pursuant to the Code of Federal Regulations, the United States Coast Guard, "a vessel must be operated in accordance with applicable laws and regulations and in such a manner as to afford adequate precaution against hazards that might endanger the vessel and the persons being transported." 46 CFR § 185.100. Yet, Plaintiffs-Petitioners argue that since the master of the vessel was in charge of the navigation of LA NENA II, including lookout duties, another person was not necessary to perform said functions. The Court disagrees, as each time LA NENA II was navigated without one of its required crew members, including during the subject voyage, it was being navigated in violation of the *Certificate of Inspection* and federal regulations, i.e, 46 CFR §§ 176.100(b) and 185.100.[12]

It is important to note that LA NENA II was not equipped with a GPS, radar, fathometer or radio for the subject voyage, and prior thereto. *See* ¶ 33. As to the compass, although Mr. García-Torres confirmed there had always been one on top of the console, it is undisputed that Mr. Hernández-Zapata realized the compass light was not working at least one (1) month before the subject voyage. Although it was reported, and the owner said it would be repaired it was still not

---

[12] (a) A vessel to which this subchapter applies <u>may not be operated without</u> having on board a valid U.S. Coast Guard <u>Certificate of Inspection</u>. (Emphasis ours).

(b) Except as noted in § 176.114 of this part, each vessel inspected and certificated under the provisions of this subchapter must, when any passengers are aboard during the tenure of the certificate, be in full compliance with the terms of the certificate.

working on the night of the incident. *See* ¶¶ 34, 35. In spite of the fact that the parties agree the lack of compass is not a violation of a regulation, a lack of a working compass cannot be disregarded as it is also undisputed that Mr. Hernández-Zapata in order to navigate uses visual navigation and a compass. *See* ¶ 38. And the reason for using a compass is that he does not have any other navigation instruments available in the vessel. *See* ¶¶ 38, 39. According to Mr. Hernández-Zapata, from the time they leave the dock there is an established route that captains have. Since La Parguera has a lot of reefs, he follows the established route with or in conjunction with a compass, and he uses silhouettes or marks of the hills. *See* ¶ 40. However, proper equipment provides a Captain the required assistance in navigation, particularly on night trips.

We must bear in mind that Hernández-Zapata claimed that getting to the Bioluminescent Bay is not an easy undertaking, it was very dark in the area on the night of the incident, which most certainly impairs the visibility of a Captain, and most critical, he knew there would be a lot of traffic in the area as it was a National Holiday in Puerto Rico, to wit, Constitution Day. *See* ¶¶ 50, 52, 68. Proof of Mr. Hernández-Zapata's remarks was the fact that there were twenty-eight (28) passengers on LA NENA II during the subject voyage, as well as the Master and a swimmer. *See* ¶ 47. According to the *Certificate of Inspection* only thirty-two (32) people were allowed at the vessel at the same time. *See* ¶ 15. It is reasonable to conclude that at the time of the incident the vessel was almost full capacity.

Another element present before the subject voyage was that approximately two (2) hours prior to departure, Mr. Hernández-Zapata became aware that Mr. Reyniel Ortiz, the person who normally worked as a Deckhand and who had a Captain's license would not be joining him on the trip to Bioluminescent Bay. *See* ¶ 53, 54, 69. Mr. Hernández-Zapata, accordingly, called Mr.

García-Torres to advise him that Captain Ortiz was unavailable and to obtain authorization to call Pablo "the swimmer" to work on LA NENA II. There is no question that Mr. García-Torres authorized Mr. Hernández-Zapata to call Pablo "the swimmer". *See* ¶¶ 56, 57. It is important to add that the duties of Pablo "the swimmer" were not those of a Deckhand, he was only there as a swimmer, that is, to jump into the water to activate the water's bioluminescence. *See* ¶ 58. Therefore, Pablo "the swimmer"'s presence did not correct the fact that LA NENA II was being operated in violation of regulation 46 CF 176.100(b) for "fail[ing] to be in full compliance with the terms of COI when operating with passengers on board," as there was no Deckhand onboard. *See* ¶¶ 102, 104; *see also* Exhibit No. 3. Said violation was admitted by Mr. Hernández-Zapata when signing and circling his acceptance in the *Warning in Lieu of Suspension and Revocation Proceedings*. *See* Factual Findings ¶ 104, 105, 106; *see also* Exhibit No. 4.

Finally, another factor that should be considered is that LA NENA II did not have a manual or set of instructions in writing describing the duties of a Master, Deckhand and swimmer, and instead Mr. Hernández-Zapata had to describe the following customary duties of a Deckhand when the position was filled by a person who held a Captain's license, to wit, (a) the person is a Captain while at the same time serves the function of a deckhand; (b) he is always near the Captain, observes along the route and ties up the vessel when it arrives at the dock; (c) he would be observing the rout and possibly obstacles coming to the vessel doing practically the same thing as the Captain; and (d) he would be watching the route, while the Captain would be focused visually on the gauges on the panel. *See* ¶¶ 66, 67.

It is further undisputed that Pablo "the swimmer" was not provided with any written documents as to his duties only oral instructions instructing him that his duty was to, as a

swimmer, jump in the water even when the Code of Federal Regulations specifically requires that, "[t]he owner, charterer, master or managing operator [] instruct each crew member, upon first being employed and prior to getting underway for the first time on a particular vessel and at least once every three months, as to the duties that the crew member is expected to perform in an emergency . . ." *See* ¶ 62; *see also* 46 CFR § 185.420. Accordingly, it is impossible for a swimmer without a Captain's license to replace the role of a Deckhand, particularly in an emergency situation. There is no question that a Deckhand, as described by Mr. Hernández-Zapata is an additional Captain on the vessel who provides, primarily, visual support during the navigation to the lead Captain, while being able to perform the same duties as the Captain.

Applying the legal standards noted above to the facts, the Court finds that the two elements required to deny an exoneration and limitation of liability are present here. All the factors previously set forth preexisted the subject voyage and collision and occurred within the actual knowledge of Mr. García-Torres and Mr. Hernández-Zapata, as owner and Captain of LA NENA II, respectively. They were both aware of the fact that the vessel was devoid of aids and devices to facilitate safe navigation. They also knew that the compass was not working at least one (1) month before the incident. They were also aware that Pablo "the swimmer" did not possess a Captain's license and his duties were limited to jumping into the water and activate the water's bioluminescence. Mr. García-Torres, a licensed Captain, was notified, approximately two (2) hours before the voyage that the Deckhand would not be available, and instead of making himself available to act as Deckhand of the subject voyage, he simply authorized Pablo "the swimmer"'s presence as a second crewmember which in no way substitutes a Deckhand. Therefore, not only were Claimants able to demonstrate that Mr. García-Torres was negligent in

allowing the LA NENA II vessel to leave the dock without a Deckhand, and without aids and devices to facilitate safe navigation by undisputed testimony and supporting documentation but Plaintiffs-Petitioners have failed to demonstrate lack of privity or knowledge as to said negligence on behalf of the owner and the Captain of LA NENA II, particularly as to the fact that leaving the dock without a Deckhand was a violation of regulation 46 CF 176.100(b) and that in absence of the two (2) crew members required in the *Certificate of Inspection*, LA NENA II was not allowed to leave the dock on the night of July 25, 2017.

On another note, the Court will not delve into the circumstances surrounding the accident, as there are genuine disputes of material facts regarding the impact between the ANDREA GABRIELA and LA NENA II, including whether the LA NENA II navigation lights were on or off before the incident occurred; whether there was an overtaking of the LA NENA II from the ANDREA GABRIELA in violation of the International Navigation Rules, and which grade of negligence, if any, is imputable as to each vessel. As there are genuine issues of material facts regarding violation of rules or regulations related to the proper lighting and navigations of the vessels, the Court deems that the standard is not met to activate the presumption of the Pennsylvania Rule. Nonetheless, the Court deems that said presumption was not required to be activated in order to deny exoneration or limitation of liability as to the owner of LA NENA II.

Finally, as to the *Home Port Doctrine*, Claimants correctly assert that "Plaintiffs-Petitioners did not address this issue at all in their Opposition, such that the argument stands unopposed." Docket No. 216 at 7. Not only is the issue unopposed but the Court agrees with Claimants that pursuant to the *Home Port Doctrine* a request for limitation of liability should be denied when the vessel seeking limitation and its owner and the casualty all occur in the local

waters of the vessel's home port. It is undisputed that Mr. García Torres lives in Lajas, Puerto Rico, within three (3) minutes by car from the home port.  LA NENA II's home port is located at La Parguera in Lajas, Puerto Rico, and the collision occurred in local waters of the vessel's home port. Therefore, a denial of limitation of liability is also warranted pursuant to the Home Port Doctrine.

The reality is that LA NENA II should have never left the dock on the night of July 25, 2017, regardless of potential violations incurred by the ANDREA GABRIELA during the subject voyage. Determining that Mr. García-Torres as owner of LA NENA II, is not subject to exoneration or limitation of liability does not require an analysis as to the collision and ANDREA GABRIELA's violations at this time. Such determinations are left for the sound discretion of the Jury. Therefore, the Court finds that Mr. García Torres, as shipowner of LA NENA II, cannot benefit from an exoneration and/or limitation of liability.

**B.    *Guardian's Limitation of Liability pursuant to Shipowners' Limitation of Liability Act***

Claimants allege that the Insurance Policy issued by Guardian does not contractually limit the insurance company to the liability of the owner of M/V LA NENA II under the *Shipowner's Liability Act*, based on Fifth Circuit precedent on *Crown Zellerbach v. Ingram Industries.* 783 F.2d 1296 (5th Cir. 1986)(*en banc)*. Essentially, the Fifth Circuit determined that when a specific provision in the policy fixes the maximum liability of the insurer to the owner's judicially declared limitation of liability amount, the insurance company can benefit from the limitation afforded to the owner of the vessel. However, Claimants argue that "the Commercial Yacht Policy issued by Guardian in this instance does not contain a Crown Zellerbach clause." Docket No. 174 at 8.

Particularly, Section D, Third Party Liability Coverage of the Policy provides the following as to Guardian's Limit of Liability:

> "The limit of liability shown for Third Party Liability on the Coverage Section Page is our maximum limit of liability under this Section. This is the most we will pay, regardless of the number of insured persons, claims made, or watercraft involved in any one accident, or series of accidents arising out of the same event."

See Factual Finding ¶ 27; see also Commercial Yacht Policy No. CYP 00003-16, Exhibit No. 2. The maximum limit of liability shown for Third Party Liability is one million dollars ($1,000,000.00). See ¶ 22; see also Exhibit 2. Claimants argue that "[t]here is no mention of limitation of liability or that Guardian is entitled to limit its liability when the assured is entitled to limit its liability under the Shipowner's Limitation of Liability Act or any other law. Docket No. 174 at 8. Particularly, as to liability coverage, the Policy provides that,

> "[w]e will pay damages for bodily injury or property damage for which any 'covered person' becomes liable through the ownership, maintenance or use of the 'insured watercraft'. This includes liability for property damage to another watercraft which exceeds the amount of insurance provided in the Collision liability coverage in Section A, Watercraft and Equipment. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. <u>Our obligation to settle or defend ends when the amount we pay for damages equals our limit of liability for this coverage</u>."

See Factual Finding No. 26; see also Exhibit No. 2 of the instant Opinion and Order. (Emphasis ours).

In turn, Guardian asserts that "[Claimants] erroneously argue that only the exact language used in the policy in Crown Zellerbach can be used to achieve that basic contractual goal," which is described as a "talismanic language." Docket No. 202 at 3. However, it is Guardian's position that Crown Zellerbach did not establish a standard language requirement in order to be eligible for said limitation. According to the Court of Appeal of Louisiana, Fourth Circuit "[n]owhere in

the *Crown Zellerbach* opinion is there a requirement that such a limitation be 'admiralty—limitation of liability specific' as argued by the plaintiff. To the contrary, the language from *Crown Zellerbach* speaks in general terms, and is remarkably close to the terminology found in the policy at issue in the instant case." *Rogers v. Texaco, Inc.*, 60 So.2d 347, 349; 1994 A.M.C. 2148 (La. Ct. App. 1994).

Generally, questions regarding the interpretation of maritime insurance policies are governed by state law. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310; 75 S.Ct. 368; 99 L.Ed. 337 (1955). Accordingly, the Puerto Rico Civil Code firmly provides that "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." P.R. Laws Ann. tit. 31 § 3471. In instances wherein "[t]he interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity." P.R. Laws Ann. tit. 31 § 3478. Therefore, "where a policy's language is unclear, we must construe the provisions against the insurer." *Lopez & Medina Corp. v. Marsh USA, Inc.*, 667 F.3d 58, 64 (1st Cir. 2012).

Upon a careful review of the provisions included in *Commercial Yacht Policy 00003-16*, the Court finds that the terms that were utilized by the insurance company when preparing the policy do not make the insurer eligible to benefit from a limitation afforded to the owner of the vessel. There is certainly no mention on the policy that Guardian is entitled to limit its liability when the insured has been afforded a limitation to its liability pursuant to the *Shipowner's Limitation of Liability Act*. The policy specifically provides that "[its] obligation to settle or defend ends when the amount [it] pay[s] for damages equals [its] limit of liability for this coverage." ¶ 26. Accordingly, Guardian provides its own limit to liability which on third party liability is up to

one million dollars ($1,000,000.00) but does not provide a limitation to the coverage if the owner if afforded a limitation to its liability. *See* ¶ 22. Therefore, Guardian's liability is not contractually limited to the liability of the owner pursuant to the *Shipowner's Limitation of Liability Act.*

However, Guardian will only be liable up to the amount the insured is liable to pay. Therefore, pursuant to the terms of the Policy, Guardian will not be ordered to pay an indemnity amount over the amount Plaintiffs-Petitioners may be ordered to pay should they be held liable for the damages suffered by the Claimants.

**C.     The role of Captain José Luis Hernández-Zapata as Captain of LA NENA II**

Pursuant to the *Complaint*, Claimants "seek to recover damages suffered while travelling as passengers aboard the commercial vessel La Nena II in La Parguera, Puerto Rico," which are "the result of a collision caused by the negligent actions of La Nena II, its Owner and Captain." *See* Docket No. 1, ¶¶ 1-2, 31 in consolidated case no. 17-2145 (DRD). Furthermore, Captain Hernández-Zapata was also named as a Codefendant in the *Counterclaim and Thirty-Party Complaint* filed by Co-Claimants, Sharisse Jenine Johnson and Lourdes Beth Rodríguez. *See* Docket No. 36.

Specifically, the *Limitation Action* filed by Guardian was filed "on their behalf, [and] on behalf of their liability insurers and underwriters, shareholders, managers and agents that would be entitled to exoneration from or limitation of liability to the same extent as the owners, and their liability in their premises, if any, shall, accordingly, not exceed that of the liability of the plaintiffs-petitioners, if any." *Factual Finding* No. 29. After all, the benefits of the *Act* are "conferred to ship owners only," therefore, does not apply "to masters, officers, or seamen." *Zapata Haynie Corp. v. Arthur*, 926 F.2d 484, 485 (5th Cir. 1991).

As previously discussed, owner, for the purposes of the *Act* "includes a charterer that mans, supplies, and navigates a vessel at the charterer's own expense or by the charterer's own procurement. 46 U.S.C. § 30501. Particularly, the Act allows a vessel owner to limit its liability for damages and injuries, among others, "incurred, without the privity or knowledge of the owner," to an amount that "shall not exceed the value of the vessel and pending fright."  46 U.S.C. § 30505.

Plaintiffs-Petitioners argue that "[t]he term 'owner' is not defined in the [Act] and courts have deemed it to be an 'unethical word' to be given broad construction." Docket No. 202 at 5. "The Supreme Court has frequently declared that the terms of the Limitation Act should be given a broad construction so as to achieve Congress' purpose: to induce and encourage investment in shipping." *Admiral Towing Co. v. Woolen*, 290 F.2d 641, 645 (9th Cir. 1961). Therefore, "the term 'owner' has [] been given a liberal definition, one that coincides with popular notions of the meaning of ownership. *Id.*

It should be noted that "duty to control increases proportionally with the possibility of control." *Complaint of Armatur, S.A.*, 710 F. Supp. 390, 399 (D.P.R. 1988). Therefore, "[t]he ability, and duty, to control therefore increases with more restricted operations. *Id.; see Matter Of Texaco, Inc.*, 570 F.Supp. 1272, 1278 (E.D.La.1983). We must also take into account that,

> [t]he great majority of the cases denying limitation of liability have involved old barges, tugs, and other vessels obviously more capable of control by the home office than a freighter thousands of miles away. And most of these cases involved either a long-standing practice of failing adequately to inspect the vessel, or otherwise to exercise control over activities in the home port.

*Waterman S. S. Corp. v. Gay Cottons*, 414 F.2d 724, 733 (9th Cir. 1969).

Pursuant to the *Limitation Action* filed by Plaintiffs-Petitioners, "[a]t all times material hereto, Mr. García-Torres was and is a resident of Lajas, Puerto Rico." Factual Finding ¶ 2. It is also alleged that, "[a]t all times material to this action, Mr. García-Torres was, and continues to be, the registered owner of the LA NENA II." ¶ 3.

Applying the legal standards noted above to the facts, it would be unreasonable to conclude that Captain Hernández-Zapata is the "owner" of the vessel for purposes of the Limitation Action, even when applying a broad construction to the term. Although it is uncontested that the Captain of LA NENA II at the time of the collision incident was Mr. Hernández-Zapata (¶ 24), it is also uncontested Mr. García-Torres, as owner of the vessel, had ample capability of "control" living about "three minutes travel time by car from LA NENA II's berth."[13] ¶ 8. It is uncontested that Mr. Hernández-Zapata does not have ownership interest on the insured vessel LA NENA II. ¶ 25.

Moreover, § 30501 clearly provides that a charterer would be considered an owner if it "navigates a vessel at the charterer's own expense or by the charterer's own procurement." 46 U.S.C. § 30501. Said situation is not present here. Plaintiffs-Petitioners fail to properly demonstrate that Mr. Hernández-Zapata had sufficient control over the vessel that could deem him owner of LA NENA II. Particularly, it is uncontested that Mr. Hernández-Zapata had worked for Mr. García-Torres for the five (5) years prior to the incident. *See* ¶ 29. The degree of control Mr. García-Torres had over LA NENA II, and Mr. Hernández-Zapata's obvious lack thereof, was the fact that when he found out that the person who normally works as a deckhand, namely, Reyniel Ortiz, would not work on the night of the subject voyage, he had to call Mr. García-Torres

---

[13] The Court takes judicial notice that La Parguera is located at the Municipality of Lajas, Puerto Rico.

to advise him the situation. *See* ¶ 57. It was in that telephone conversation that Mr. García-Torres authorized Mr. Hernández-Zapata to call Pablo "the swimmer" to work on LA NENA II. *See id*. Additionally, although Mr. García-Torres was not present at the time of the accident, he was informed of the collision at approximately 10:30-11:00 p.m. *See* ¶ 73. Finally, no evidence was presented to sustain that Mr. Hernández-Zapata operated LA NENA II at his own expense or procurement. Accordingly, the Court finds that Mr. Hernandez-Zapata is not entitled to limit his liability under the *Shipowner's Limitation of Liability Act*.

**D.     *Guardian Insurance Company's maximum liability limit***

As previously discussed, the maximum limit of liability shown for Third Party Liability is one million dollars ($1,000,000.00). *See* Factual Finding ¶ 22; *see also* Exhibit 2. Mr. Hernández-Zapata is insured by the policy issued by Guardian. *See* ¶ 24. However, Guardian will only be exposed to pay and indemnification up to the one-million dollars ($1,000,000.00) established in the policy. *See* ¶ 22. The Court agrees with Guardian that fact that there is a policy for one-million dollars ($1,000,000.00) does not mean that such amount will be exhausted. However, that is only the limit of exposure as to the insurance company.

## V.     CONCLUSION

From an analysis of the documents presented and the arguments therein, it is evident to the Court that several material facts regarding the collision are still in controversy. Said matters will be taken to the jury in trial. The jury will then determine the level of negligence between the owners of the ANDREA GABRIELA and LA NENA II vessels.

For the aforementioned reasons, the Court hereby **GRANTS** Claimants, *Motion for Summary Judgment and Memorandum of Law in Support Thereof* (Docket No. 172) and *Joint*

*Motion for Summary Judgment Deciding that the Insurer and the Captain of the Charter Tourist Boat La Nena II are not Entitled to Limit their Liability Under the Shipowner's Limitation of Liability Act and Memorandum of Law in Support Thereof* (Docket No. 174). Whereas, Plaintiffs-Petitioners' *Memorandum in Support of Motion for Summary Judgment* (Docket No. 177) is hereby **DENIED.** Therefore, Plaintiffs-Petitioners *Petition for Exoneration from or Limitation of Liability* (Docket No. 5 in consolidated case no. 17-2168 (DRD)) is hereby **DISMISSED WITH PREJUDICE.**[14]

 **IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2021.

 *S/Daniel R. Domínguez*
 Daniel R. Domínguez
 United States District Judge

---

[14] Nonetheless, the Court will refrain from issuing a partial judgment at this time. The First Circuit strongly disfavors partial judgments as they foster piecemeal appeals. *Nichols v. Cadle Co.*, 101 F.3d 1448, 1449 (1st Cir. 1996)("piecemeal appellate review invites mischief. Because the practice poses a host of potential problems we have warned, time and again, that Rule 54(b) should be used sparingly."); *Zayas-Green v. Casaine*, 906 F.2d 18, 21 (1st Cir. 1990)("This final judgment rule . . . furthers 'the strong congressional policy against piecemeal review.'" *Id.* (*quoting* In re Continental Investment Corp., 637 F.2d 1, 3 (1st Cir. 1980)); *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and Sewer Authority*, 888 F.2d 180, 183 (1st Cir. 1989); *Consolidated Rail Corp v. Fore River Ry. Co.*, 861 F.2d 322, 325 (1st Cir. 1988); *Spiegel v. Trustees of Tufts Coll.*, 843 F.2d 38, 43 (1st Cir. 1988); *Santa Maria v. Owens-Ill., Inc.*, 808 F.2d 848, 854 (1st Cir. 1986)); *see also United States v. Nixon*, 418 U.S. 683, 690 (1974).